IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Submitted on Briefs November 16, 2001 Session


**STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S
SERVICES v. D.G.S.L.**

**IN THE MATTER OF:  D.L.L. and L.L.L.**

**Appeal from the Juvenile Court for Knox County
No. L-3955     Carey E. Garrett,  Judge**

---

**No. E-2001-00742-COA-R3-JV
Filed December 28, 2001**

---

In this appeal, D.G.S.L. ("Mother") challenges the termination of her parental rights, claiming there was insufficient proof to establish grounds for termination or that it was in the best interest of the children to terminate the parent-child relationship.  Mother also claims her due process rights were violated when she did not receive notice of the initial hearings in this matter and, therefore, was not present or represented at those hearings.  We affirm the decision of the Juvenile Court terminating Mother's parental rights.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the
Juvenile Court Affirmed; Case Remanded.**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.


Julie Anne Foster, Knoxville, Tennessee, for the Appellant D.G.S.L.


Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

This appeal is from an Order of the Juvenile Court for Knox County terminating Mother's parental rights to her two sons, L.L.L. (age 8) and D.L.L. (age 7). The children's father, V.L.L. ("Father") also had his parental right terminated, but he has not appealed that determination.

The record in this case begins with a Temporary Bench Order of Legal Custody entered by the Juvenile Court Referee in May of 1998. Mother was not present at this hearing because she was in jail. The Temporary Bench Order was based upon a petition filed by the Department of Children's Services ("DCS"), but neither the petition nor the proof relied upon by the Referee are contained in the record on appeal. In the Temporary Bench Order, the Referee found that probable cause existed to believe Mother's two sons were dependent and neglected. The Referee also found that continuing to allow the children to live in the home was contrary to the children's best interests and welfare, and that a less drastic alternative was not available. Due to the apparent emergency nature of the situation, the Referee transferred custody of the two children to DCS pending an interim hearing two days later.

The Referee entered an Interim Order after the interim hearing transferring custody of the children to DCS. The Order was based on evidence and testimony of the children's Guardian ad Litem, a report filed by DCS, an incident report filed by the law enforcement officers who removed the children from the home, as well as testimony by a DCS representative. Mother was not present at this hearing since she was still in jail for a violation of probation and shoplifting.

The Referee's Interim Order detailed the events giving rise to the initial removal of the children from the custody of Mother and Father. Law enforcement officers were summoned by Father to his house to remove Father's brother and some friends who were drinking alcohol and refused to leave. Before the police arrived, Father apparently left the children with his brother and his brother's friends and went to the store to purchase cigarettes. When Father returned, there was a pit bull in the bath tub, the children were asleep on the floor, and Father's brother and brother's friends were still consuming alcohol. When the law enforcement officers arrived, they observed roaches crawling over the sleeping children. The Referee also noted that an eviction notice had been served stemming from complaints by neighbors and "excessive 911 involvement with the family." The children apparently were sleeping on the floor because the bedrooms were not heated and only one bed in the house had a mattress. The Guardian ad Litem expressed concerns about the children's personal hygiene, the inability of Head Start to locate Mother and Father on one occasion when the children were being returned home, as well as complaints by neighbors that the children were being left unattended.

After the hearing, Ms. Cynthia Templin ("Templin") from DCS attempted to locate Mother and Father to discuss the situation, but had trouble finding them. Templin finally located both of them at the Penal Farm. Templin then met with Mother and Father separately and reviewed each of the responsibilities outlined in the Foster Care Plan or Permanency Plan ("Plan") which had

been developed to correct the situation and enable Mother and Father to properly care for their children. Both Mother and Father expressed their agreement by signing the Plan.

Another hearing was held on July 7, 1998, at which time the Referee entered an Order placing the children into protective custody. Mother was not present at this hearing because she was still incarcerated. Mother claims she did not receive notice of this hearing. Once again, the Referee found the children to be dependent and neglected and that it was contrary to the best interests of the children to remain in the care or custody of either parent. The Referee also adopted the terms of the Plan after concluding that it was reasonably related to the goal of reuniting the family.

Another hearing was held in March of 1999, at which time the Referee continued to keep the children in the care of foster parents due to Mother's and Father's lack of progress and noncompliance with the terms of the Plan. Mother was still in jail and claims that notice of this hearing was sent to her home instead of the jail and was, therefore, defective. She does not state that she did not receive notice or that she was not made aware of the hearing, only that the notice should not have been mailed to her home address.

On November 19, 1999, DCS filed a Petition to Terminate Parental Rights. As it pertains to Mother, the Petition alleged she had willfully failed to visit or to engage in more than token visitation with the children for a period of four consecutive months. DCS acknowledged that Mother was in jail for the majority of the relevant time. DCS asserted, however, that she was incarcerated based on her willful acts of shoplifting and violating probation, and as a result, her incarceration constituted willful abandonment of the children because she knew her criminal acts would result in the suspension of her ability of visit with the children. It also was alleged that Mother willfully abandoned the children by not paying any child support for a period of four consecutive months. DCS asserted it had made reasonable efforts to assist Mother in establishing a suitable home for her children, but she had not made a reasonable effort to accomplish this objective. DCS claimed Mother demonstrated such a lack of concern that it appeared unlikely she would be able to provide a suitable home for her children. It also was alleged there was little likelihood that the conditions leading to the removal of the children from the home would be remedied and that these conditions had persisted for a period of six months. According to the Petition, continuing the parent-child relationship would greatly diminish the children's chances of early integration into a stable and permanent home. The one-bedroom apartment where the parents lived had fungus growing on the walls, and apparently Mother and Father admitted the apartment should be condemned and the children could not live there. While the parents claimed they were "working on" obtaining suitable housing, no real progress had been made. DCS asserted that neither Mother nor Father were in compliance with the Plan which they had agreed to previously. Finally, DCS maintained that termination of the parent-child relationship was in the best interests of the children.

On February 17, 2000, Mother was appointed counsel to represent her. The hearing on the petition to terminate Mother's parental rights was held in October 2000. At the hearing, Mother testified she lived in Oklahoma prior to moving to Tennessee. She served eighteen months in jail in Oklahoma for prostitution and possession of marijuana. She was in jail for three days in

Denver, Colorado, for "solicitation for a ride". When this occurred, she was pregnant with her oldest child. After moving to Tennessee, she was arrested on May 6, 1998, for shoplifting from Kroger. She remained in jail from May 6 through August 10, at which time she was released on probation and ordered to go to a halfway house. Approximately three months later, on November 15, 1998, Mother was arrested for violation of probation. There also were new charges brought against her. Mother claimed she could not remember exactly what those new charges were, but "there was a gun involved and there was drugs involved." She remained in jail until April 22, 1999. Less than two months later, on June 16, 1999, Mother again was arrested for violating her probation after being charged with theft from Kroger. She remained in jail until August 11, 1999. She was arrested yet again on March 18, 2000, for stealing cigarettes from Kroger and was released on probation after being in jail for three hours. About a month and a half later, on May 1, 2000, Mother was arrested for possession of a gun and possession of crack cocaine with intent to distribute. She remained in jail until May 4, 2000. On June 1, 2000, she was arrested for domestic violence on Father and was in jail until August 13, 2000. Mother testified she was in jail for theft when she learned that her children had been taken into protective custody.

Mother went to live at a half-way house after being released from jail after her most recent arrest. Mother was "kicked out" of the half-way house, although there was some dispute as to the reason why this happened. After leaving the half-way house, she lived with a male friend. The friend's place had only one-bedroom, but Mother claims there were two beds. Mother then moved to downtown Knoxville and lived with four or five people before locating her own apartment. Mother also lived at the Red Carpet Inn at some point before locating the apartment. Mother had been in the apartment for one week at the time of the trial. Mother admits there is inadequate room in this apartment for her and her two children. Mother admitted she was required in the Plan to resolve all "legal issues" and that she had agreed to do this. Notwithstanding this agreement, she was arrested five times after agreeing to the terms of the Plan. Mother admitted she was a drug addict, and at the time of trial she had been "clean" for one week. She had been employed at a restaurant for two weeks. Mother stated she took each day minute by minute and could not make any assurances to the Court that she could stay clean.

Mother claimed she was unable to complete the drug and alcohol assessment because she did not have any insurance. She denied being given a referral from DCS. She missed some of her appointments for drug and alcohol treatment. She claimed to be attending AA and NA meetings every day, but she did not bring the supporting documentation to verify this because it "slipped" her mind. She began parenting classes a little over one month before trial. She began taking GED classes two weeks before trial. Mother admitted she was ordered to pay five dollars per month in child support and that she did not pay that. Her visitation with the children was lost because of her incarceration.

The only other witness at trial was Rachelle Reed ("Reed"), who was the home-county case manager for the two children. According to Reed, when the children first came into protective custody, they had behavioral and developmental problems and were acting out sexually. When Mother and Father were still exercising visitation privileges, the children's behavioral problems increased to the point where one of the children had to be removed from school. When

Mother and Father were not exercising any visitation, the behavior of both children improved. In fact, at one point the children were able to cease treatment, at which time it was recommended that visitation remain suspended. Reed testified that Mother was in no better position to care for her children than when the children were initially taken into protective custody. The two primary conditions leading to the removal of the children (i.e., Mother's drug addiction and lack of housing) had not been resolved. Reed testified that when she would try to help Mother comply with the Plan, Mother would become defensive and tell Reed it was none of her business to make referrals. Mother would hang up the telephone on Reed. Since Mother had lived in five different places since the last time she was released from jail, Reed stated she did not believe there was any likelihood that the housing issue would be resolved. Reed stated that Mother was given every necessary referral in order to complete the terms of the Plan. Mother would miss meetings scheduled by Reed. Had Mother shown up for these meetings, Mother would have been provided more information on necessary referrals. Reed stated the children had been released from counseling because the foster mother was cooperating fully. Both children are now making high grades in school. Reed testified the children were afraid to go back to their parents.

After the trial, the Juvenile Court Judge entered an order terminating Mother's parental rights and placing custody of the children with DCS. The Trial Court held that the State had met its burden of proving by clear and convincing evidence several issues. These conclusions, which we paraphrase, are as follows:

> 1.      That the children were previously found to be dependent and neglected and placed in the custody of DCS; that DCS had made reasonable efforts to prevent removal of the children or the situation prevented reasonable efforts from being made; that DCS had made reasonable efforts to assist Mother in establishing a suitable home for a period of four months following removal of the children; and that Mother had not made reasonable efforts to provide a suitable home and demonstrated a lack of concern to such a degree that it appeared unlikely that she would be able to provide a suitable home at an early date.

> 2.      That the children have been removed by order of the court for a period of six months; that the conditions which lead to their removal still persisted as did other conditions which would cause the children to be subjected to further abuse and neglect and which prevented their return to Mother; that there was little likelihood that these conditions would be remedied at an early date so the children could be returned in the near future; and that continuing the legal parent and child relationship would greatly diminish the children's chances of early integration into a stable and permanent home.

3.    That Mother failed to comply in a substantial manner with the reasonable responsibilities set out in the Plan related to remedying the conditions which necessitated foster care placement.

4.    That Mother had abandoned the children by willfully failing to visit them and willfully failing to make any contribution whatsoever toward the support of the children for four consecutive months immediately preceding the filing of the petition.

The Juvenile Court also found by clear and convincing evidence that Mother was addicted to crack cocaine and to support her addiction, she had made decisions during the time the children were in foster care which showed her lack of concern and her inability to put their needs first, as demonstrated by Mother's significant criminal record. The Juvenile Court also took specific note of the fact that Mother had used drugs just one week before trial. Although DCS and the state probation office tried to help Mother with her addiction, nothing worked. Mother had at least four different residences since being released from jail the most recent time and currently was living in a studio apartment which she admitted would not be suitable for the children. According to the Juvenile Court, Mother refused to accept referrals for assistance and had yet to maintain any period of sobriety. The Juvenile Court noted that Mother admitted she was not yet able to take care of the children and was not sure when she would be able to do so. By her choice in committing criminal acts that resulted in incarceration, Mother disrupted her visitation with the children. She refused to make any child support payments when she was not in jail, and then was unable at other times because she was in jail. The Juvenile Court concluded it was in the children's best interest to terminate the parental rights of Mother and transfer complete custody and control of the children to DCS.

Mother appeals, raising four issues: 1) whether DCS met its burden of proof at the termination hearing; 2) whether she was afforded appropriate notice of the hearings and whether she received due process at all stages of the proceedings; 3) whether DCS fulfilled its obligations when it failed to provide Mother with appropriate resources to enable her to meet the goals of the Plan; and 4) whether DCS fulfilled its statutory obligations when it failed to provide relevant information regarding the requirements of the Plan.

**Discussion**

A review of findings of fact by a trial court is *de novo* upon the record of the trial court, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Brooks v. Brooks,* 992 S.W.2d 403, 404 (Tenn. 1999). Review of questions of law is *de novo,* without a presumption of correctness. *See Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999).

We first address the issues raised by Mother regarding the Juvenile Court's determination that there was clear and convincing evidence of grounds to terminate her parental rights. It is well established that "parents have a fundamental right to the care, custody, and control

of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith,* 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer,* 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,* 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier,* 905 S.W.2d at 188.

Initiation of termination of parental or guardianship rights may be based upon a number of statutory grounds. The three grounds pertinent to this appeal are:

(1)      Abandonment by the parent or guardian, as defined in [prior law], has occurred;[1]

(2)      There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

     (i)      The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

     (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

     (iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g).

The Juvenile Court found there was clear and convincing evidence that Mother had met all three of these statutory grounds for termination of her parental rights. In making this determination, the Juvenile Court had access to reports from the DCS representative and the reports of the Guardian ad litem. The Juvenile Court heard the testimony of the DCS representative and Mother. "Unlike this Court, the [Juvenile Court] observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). The trial court's determinations regarding credibility are accorded considerable deference by this Court. *Id.*; *Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). "'[A]ppellate courts will not re-

---

[1] The statutory definition of "abandonment" referenced in this statute has been declared unconstitutional. Hence, we have substituted "prior law" to reference the law which is to be applied until the statute is amended by the legislature.

-8-

evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.'" *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Based on our review of the record, including the facts detailed above, we do not believe the Juvenile Court committed any reversible error in its conclusion that clear and convincing evidence existed to terminate Mother's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii). Mother's last minute efforts to attempt to comply with the requirement of the Plan and remain drug free simply cannot form the basis for a conclusion that these statutory requirement have not been met. This is especially true since Mother admittedly still is not able to properly care for her children or provide them a suitable place to live. Because we affirm the termination of Mother's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and (g)(3)(A)(i) through (iii), we pretermit Mother's argument that she had not abandoned the children or willfully failed to support them due to her incarceration.

Having affirmed that two of the three statutory grounds for termination were proven by clear and convincing evidence, we next address Mother's claim that it was not proven by clear and convincing evidence that the termination of Mother's parental rights was in the best interests of the children. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

> (i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> > (1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)      The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)      Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)      Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)      Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)      Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). When taking into account these relevant considerations, as well as Mother's testimony and admissions coupled with the testimony of Reed, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence existed that it was in the best interest of the children to terminate Mother's parental rights.

Next, we consider Mother's argument that she was not made aware of the initial hearings where the children were found to be dependent and neglected and was otherwise not afforded her due process rights since she was in jail and no one made sure she was present or represented at these initial hearings. Tenn. R. Sup. Ct. Rule 13 § 1(d)(7) states that parents have a right to counsel at all stages of proceedings involving dependency and neglect issues or termination of parental rights. There is nothing in the record to indicate that Mother raised this issue at the trial court level after an attorney was appointed to represent her. Issues not raised at trial may not be raised for the first time on appeal. *Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Dep't Human Serv. v. DeFriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). In addition, upon consideration of the record as a whole, and since Mother was present and

represented by counsel at the termination hearing, we hold that if this constituted error, it did not more probably than not affect the judgment, nor did it result in prejudice to the judicial process. Tenn. R. App. P. 36 (b); *see also Dep't Children's Serv. v. Wilkerson*, No. 03A01-9810-JV-00341, 1999 WL 775759, at * 2 (Tenn. Ct. App. Sept. 15, 1999) (citations omitted) (holding that no due process violation occurs where the appellant parent participates in the termination hearing and there asserted his or her plenary rights; any lack of due process initially was thereafter fully supplied). If we were to accept Mother's position on this issue, it would lead to the outlandish conclusion that once a hearing was held without Mother's or her attorney's attendance, for whatever reason, the Juvenile Court would be powerless later to hold any hearing terminating Mother's parental rights. Such is not the law. Accordingly, due to the facts and circumstances presented by the record on appeal, we find no merit in Mother's position on this issue.

Mother's next argument challenges the effectiveness of DCS in providing Mother referrals so that she could comply with the terms of the Plan. At trial, the DCS representative, Reed, testified that when she would try to help Mother comply with the Plan, Mother would become defensive and tell Reed it was none of her business to make referrals. Mother even would hang up the telephone on Reed. Reed further stated that Mother was given every necessary referral in order to complete the terms of the Plan. Mother denied receiving these necessary referrals. This involves a fact question, which the Juvenile Court obviously resolved in favor of DCS when it found that DCS had made reasonable efforts to prevent removal of the children or the situation prevented reasonable efforts from being made, and that DCS had made reasonable efforts to assist Mother in establishing a suitable home for a period of four months following removal of the children. As stated previously, "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Mother presented no such evidence.

Finally, Mother argues that because the Plan was not made a part of the technical record on appeal, (1) it cannot be established that DCS fully explained its obligations to Mother; or (2) that the consequences of not complying with the Plan were properly explained to Mother. The appellant has the duty "to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal." *Nickas v. Capadalis*, 954 S.W.2d 735, 742 (Tenn. Ct. App. 1997). In the absence of an adequate record on appeal, this Court will presume that the trial court's rulings were supported by sufficient evidence. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Since Mother failed in her duty to make the Plan part of the record, we presume that DCS met its obligations and Mother was aware of the consequences of not complying with same. Mother cannot provide an incomplete record on appeal and then challenge the termination of her parental rights because the record is incomplete. We note, however, that in any event, there is clear and convincing evidence in the record that DCS did fully explain the Plan's obligations to Mother and the consequences of not complying with the Plan.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant, D.G.S.L. and her surety.

_____
D. MICHAEL SWINEY, JUDGE